The opinion of the Court was delivered by
Lstglis, A. J,
On the night of Monday, the 22d April, 1867, soon after dark, Cornelius Newton, while with a companion in a buggy, driving slowly along the road near a small plantation settlement where he had been visiting for a few days, and whence he was then starting on his return home, was shot in the left breast by some concealed foe, and, within three quarters of an hour afterwards, died.
Leggett Quick, the prisoner at the bar, had had an old grudge of several years’ standing against him, and, at various times during the three months next preceding the death, had, to different persons, declared his purpose to kill him when an opportunity should offer, and had assigned his reasons for such purpose; and to one he had avowed that when, shortly before, an opportunity had occurred, he had been *348 prevented only by the interposition of a third party from executing, this purpose. He occupied one of the houses of this settlement only about twenty-five yards distant from the house of one Hodge, at which the deceased had been visiting, and directly opposite thereto, on the other side of the street, on either side of which the bouses were ranged; he had been in the habit of frequently visiting at Hodge’s house before, had been there on the day of Newton’s arrival, but never went there while Newton was there, and although they repeatedly passed each other within a few steps, no token of recognition or salutation was interchanged. During the afternoon of this fatal day, he had inquired of one, who, he might well suppose would know, whether Newton carried fire arms about him, and was told that he did not, and to another of the neighbors he expressed his ill will towards him in strong and bitter terms; he was observed sitting on the steps of a neighboring bouse while Newton’s preparations for leaving were going on, and when the latter started, arose, and went off in the same direction ; was found to be absent from his own house from the time of Newton’s departure until the gun was fired ; soon'after the report of the gun he appeared among the neighbors in his shirt sleeves, without excitement and having no gun, and when the firing was spoken of said " it looked like some one had killed him, but he had not done it; ” he did not go that night to Hodge’s house, to which Newton was carried after he was shot, and where he died; he was about the next day, when the Coroner was inquiring of the cause of the death, but after the inquest, disappeared, and that evening, when the Deputy Sheriff sought him at his own house, he was not there, but the house was locked with a padlock on the outside; after-wards at midnight he was found in a neighboring house alone, with the door locked, and when arrested he submitted, making no inquiry wherefore he was taken.
*349 At the recent Spring Term of the Court of Sessions, after an interval of nearly a year, the prisoner was put upon bis trial for the murder of Cornelius Newton, and was convicted.
Upon the trial, in addition to the facts above mentioned, a statement was made by Newton, about fifteen minutes before his death, in the words, “ Leggett Quids is the man who has hilled me” was admitted in evidence as his dying declaration, and the first ground of appeal excepts to this admission as error of law on the part of the presiding Judge. The Judge must necessarily determine the preliminary question, when made, of the competency and admissibility of what are offered to be given in evidence as dying declarations, as he must of any other class of testimony that is objected to. In order to the proper admission of such declarations it must appear satisfactorily that death was imminent at the time, and that the declarant was so fully aware of this as to be without any hope of life. This condition of the person is considered as constituting as strong a guarantee for the truth of the declaration, as an oath is of ordinary testimony. There must be few that would be willing to pass immediately into the presence of that Almighty Judge, whose eye penetrates all disguise, with a lie upon his lips. In the present case the deceased, when the gun was fired, was in a stooping posture, leaning his chin on his hands; in a few moments he raised himself up and cried out “Lord have mercy on me! L am shot and hilled,” and twice repeated the cry, “Lord have mercy on me!” his head fell over on the lap of his companion, and he became for the time insensible or, at least, speechless— “unable to reply to questions;” he had to be supported in the buggy by those who, in response to his companion’s cry for help, bad hurried to him, and carried him back; when they reached the enclosure of Hodge’s house, but before he was lifted from the buggy, he revived somewhat, recognized *350 Hodge, complained of bis pains, and then said — ■“ Leggett Quick is the man who has killed me;” spoke no more, and in fifteen minutes died. It is, therefore, quite certain from the event, that when this declaration was made, death was just at hand, and that there could be no ground for hope; and it seems to the Court, from this evidence, not less certain that he was too fully aware of the peril of his state, to indulge the smallest hope. The testimony was, therefore, competent. Its credibility was for the jury, and the previous chafacter of the declarant, his dissolute life, his opportunity of knowing that 'which he affirmed, and the import of his language whether expressing knowledge or only suspicion excited by previous circumstances, were elements in that credibility, and upon them all, the jury has passed. In regard to the last point the Judge carefully cautioned the jury to distinguish between a knowledge of the fact declared, and a mere suspicion of such fact, and if they thought the declaration imported no more than the latter, to reject it altogether. When the deceased was shot, he did not at once change his position; he remained stooping, leaning his chin upon his hand, and, it may be that the flash of the gun revealed his antagonist to his quickened sight, and his momentary stillness was but the temporary rigor of his riveted gaze, as penetrating the darkness, he recognized his ancient foe, and realized the certainty of the fatal issue, in the deliberate and deadly malice, that he then knew had winged the bolt. Something of this .kind the jury, under their instructions, must have found.
Witnesses were examined on the part of the defence, and so far as appears "here, .the only purpose of their examination was to convince the jury that the prisoner could not have fired the fatal shot for the reason that he could not, from the spot where the assassin must have stood, have regained the street of the settlement within the very short time afterwards at which he was seen there. This testi- *351 mouy, depending for its value upon the accuracy of the estimate of the lapse of time between two events, made under such circumstances, and reported after so long an interval, was not much to be relied on, and it is not surprising that it availed nothing to break the force of “so great a cloud” of circumstances which “ compassed about” the prisoner and pointed in converging lines with a fatal steadiness to his guilt. It is a painfully significant fact, that while the witnesses trace the prisoner’s movements up to a point of time shortly prior to the fatal moment, and take him up again at a point of time shortly subsequent thereto, no one of them can tell, where he was at that moment. In company just before — and in company just after — when this deed of death was being done he had withdrawn himself from his associates and is somewhere, not explained, alone. The appeal complains of error in the Judge’s charge in his saying that the defence was rested solely upon the proof of an alibi. This was clearly a misunderstanding in fact of the charge in this particular. But if it had been as complained, there would have been little reason for discontent, as certainly this was the only position and independent matter of defence. All else was but an effort to discredit the evidence on the part of the prosecution, and so to prove, not that the prisoner was innocent, but that the testimony against him ought not to induce a belief of his guilt, by reason not so much of any insufficiency of the facts testified to, as of the character of the witnesses.
It is further complained that the Judge charged that the prisoner, in relying upon an alibi as a defence, thereby conceded that the failure to establish such alibi would be tantamount to an admission that his guilt was proved, since it implied that the circumstances shown in evidence were sufficient in themselves to evince his guilt, and his only escape from their effect must be by the clear and positive *352 proof that he was not at the time of the deed at the place where it was done and so could not have done it. The charge on this point, as reported by the Judge, is by no means in such absolute terms as the second ground of appeal represents. The proposition, as there so carefully qualified, is liable to no just exception. Where would be the need of proof of an alibi, if the other evidence did not make out a probable case against the prisoner?
The objection made in general terms that “the verdict is contrary to law and evidence” without any specification of the particulars wherein the contradiction consists, is condemned and prohibited as a ground of appeal, by the express terms of the 99th Pule of Court, 10 Rich. 552, and ordinarily is wholly disregarded by this Court. Upon an appeal from a conviction of a capital felony, if any such contradiction were discovered by the Court, though not specified'by the appeal, it would not be refused due consideration. But the recapitulation which has been herein made of the testimony shows that the facts testified to conducted to the result expressed in the verdict with too terrible a precision to permit any reasonable doubt to linger in the most charitable mind.
The motion for a new trial is dismissed.
DüNKIN, C. J. and Wardlaw, A. J., concurred.

Motion dismissed.